**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

CARROLL GARRETT                                                              PLAINTIFF

v.                                          No. 4:07CV00065 JLH

THE HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY                                                         DEFENDANT

## OPINION AND ORDER

Carroll Garrett commenced this action pursuant to section 502(a) of ERISA to recover long-term disability benefits allegedly due him under a plan sponsored by his former employer, FedEx Freight East, Inc.  The administrative record has been filed, and both parties have submitted briefs, so this case is ripe for decision.  For the reasons stated hereinafter, the Court remands Garrett's claim for long-term disability benefits to The Hartford Life and Accident Insurance Company for a determination of eligibility.

## I.

Carroll Garrett is a sixty-two-year-old man with a high school education.  He worked as a diesel mechanic for FedEx Freight East from February 16, 1998, until January 22, 2004, when he became unable to work due to a frozen right shoulder.  He then applied for disability benefits under the ERISA plan sponsored by FedEx Freight East.  Garrett had been a diesel mechanic since 1965 and had had no other occupation as an adult.

### A.    THE TERMS OF THE PLAN

FedEx Freight East provides disability benefits to employees under a long-term disability plan insured by The Hartford Life and Accident Insurance Company.  The plan is an employee welfare benefits plan established pursuant to ERISA.  The plan defines "disability" as follows:

> **Disability or Disabled** means that during the Elimination Period and for the next 12 months you are prevented by:
> 1.   accidental bodily injury;
> 2.   sickness;
> 3.   Mental Illness;
> 4.   Substance Abuse; or
> 5.   pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

(Adm. R. 18.)  Thus, a plan participant is initially disabled if he is unable to perform one or more of the essential duties of his occupation, but after the Elimination Period plus twelve months, a plan participant must be "prevented from performing one or more of the Essential Duties of Any Occupation."  The plan defines "Any Occupation" as follows:

> **Any Occupation** means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

(Adm. R. 17.)  The Elimination Period is the first 180 consecutive days of disability or the expiration of any employer sponsored short-term disability program, whichever is longer.  (Adm. R. 5.)  The plan gives Hartford discretion to determine eligibility for benefits and to interpret the terms of the plan.  (Adm. R. 17.)

## B.    GARRETT'S CLAIM

As noted above, Garrett last worked on January 22, 2004.  In August of that year, he filed an application for long-term disability benefits.  In September of that year, Hartford approved his claim

for long-term disability benefits and began making monthly benefit payments.  In the letter to Garrett notifying that his claim had been approved, Hartford informed Garrett, "As of 7/23/05, disabled means you must be so prevented from performing the Essential Duties of Any Occupation."  Later in September of 2004, Garrett applied for Social Security disability benefits.  The record reflects that the application was approved.  However, the decision of the Social Security Administration was not included in the administrative record and has not been provided to the Court.

On January 23, 2006, Hartford sent a letter to Garrett stating that he was not prevented from performing one or more of the essential duties of any occupation and therefore was no longer eligible for long-term disability benefits.  (Adm. R. 56-60.)  Garrett appealed that determination.  (Adm. R. 55.)  On March 27, 2006, Hartford wrote another letter to Garrett, again denying his claim and stating, "This is our final determination with respect to your appeal, our record is closed and no further review will be conducted with respect to this matter."  (Adm. R. 43-44.)  On January 29, 2007, Garrett commenced this action.

## II.

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ."  29 U.S.C. § 1132(a)(1)(B).  "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (citing 29 U.S.C. § 1132(a)(1)(B)).  Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the "plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe

the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989).   Where a plan gives the administrator such discretion, the administrator's decision is reviewed for an abuse of discretion.   *Woo*, 144 F.3d at 1160 (citing *Firestone*, 489 U.S. at 115, 109 S. Ct. at 956-57).

Under the abuse-of-discretion standard, the proper inquiry is whether Hartford's decision was reasonable, that is, whether it was supported by substantial evidence. *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).  "Substantial evidence is 'more than a scintilla but less than a preponderance.'"  *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)).  "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  An administrator's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision. *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).  Under this standard, the Court should consider only evidence that was before Hartford when the claim was denied. *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003).

To obtain a less deferential review, a plaintiff must demonstrate "that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her."  *Woo*, 144 F.3d at 1160.  "To satisfy the second part of this requirement, [the plaintiff must] show that the conflict or procedural irregularity has 'some connection to the substantive decision reached.'"  *Id.* at 1161 (quoting *Buttram v. Cent. States, Se.*

4

*& Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 901 (8th Cir. 1996)).  "For heightened review to apply, a beneficiary claiming procedural irregularities must show that the plan administrator, in the exercise of its power, acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision."  *Neumann v. AT&T Commc'n Inc.*, 376 F.3d 773, 781 (8th Cir. 2004).  "[T]his requirement 'presents a considerable hurdle' for plaintiffs . . . ."  *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 679 (8th Cir. 2005) (quoting *Barnhart v. Unum Life Ins. Co. of Am.*, 179 F.3d 583, 588 n.9 (8th Cir. 1999)).

## III.

Garrett's treating physician was Dr. Bruce Sanderson, an internal medicine physician. Sanderson referred Garrett to Dr. Scott Bowen, an orthopedic surgeon, for the treatment of Garrett's frozen shoulder.  Bowen treated Garrett from February 2004 through August 2004.  Bowen treated Garrett first with physical therapy, then with manipulation under anesthesia, followed by more physical therapy, corticosteroid injections, and arthroscopic surgery.  Bowen's treatment was unsuccessful in enabling Garrett to return to his work as a diesel mechanic.  After Bowen's treatment proved unsuccessful, Garrett filed his claim for long-term disability benefits.

When Hartford began to consider whether Garrett qualified for long-term disability benefits under the "Any Occupation" standard, it sent questionnaires to Sanderson and Bowen for them to check the agreement or disagreement with two different statements about Garrett's capacities, and they asked each doctor to complete a "Physical Capacities Evaluation Form" regarding Garrett.  The questionnaires read as follows:

> Based on an 8-hour work day, do you feel Mr. Garrett can perform a Light occupation as defined:

>The U.S. Department of Labor defines Light work as lifting 20 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. Even though the weight lifted may only be a negligible amount, a job is in this category when it involves sitting most of the time with a degree of pushing and pulling of arm and/or leg controls, or when it requires walking or standing to a significant degree.

If you are in agreement please indicate below:

Agree_____          Disagree_____

If not, can he perform a Sedentary occupation in an 8-hour work day as defined below:

>The U.S. Department of Labor defines sedentary work as exerting up to 10 lbs. occasionally or a negligible amount of force frequently and constantly to lift, carry, push/pull or otherwise move objects, including the body.  It may involve sitting, with the ability to stretch and/or rest at least every two hours, and may include walking or standing occasionally.

If you are in agreement please indicate below:

Agree_____          Disagree_____

If you do not agree that Mr. Garrett can perform a sedentary or light occupation, please submit a narrative with your rationale that would support his ability to work with the above captioned restrictions and limitations, along with supporting documentation for our review (including diagnostic test results) for our review. Please fax your responses to (860-392-0713).

_____          _____
Signature                                                    Date

Bowen answered that he agreed that Garrett could perform light work but wrote in after the typed paragraph "no more than 10 lbs."  He also wrote that he agreed that Garrett could perform sedentary work.  (Adm. R. 292-93.)  Consistent with his answer to those questions, Bowen completed the Physical Capacities Evaluation Form to say that Garrett could sit, stand, and walk eight hours at a time and eight hours a day.  Bowen marked the boxes to indicate that Garrett could

constantly drive, balance, stoop, kneel, crouch, crawl, reach at waist/desk level, reach below waist level, perform fine motor work with his left hand, his right hand, and both hands, and feel with his left hand, right hand, and both hands.  According to Bowen's Physical Capacities Evaluation Form, Garrett could never lift/carry/push/pull more than ten pounds, never climb, and could never reach above his shoulder.  He could frequently perform handling that involved gross motor movements. (Adm. R. 294-95.)

In contrast, Sanderson disagreed with the statement that Garrett could perform light work and with the statement that he could perform sedentary work.  (Adm. R. 259-60.)  On the Physical Capacities Evaluation Form, Sanderson checked that Garrett could never lift/carry/push/pull any amount, could never climb, balance, stoop, kneel, crouch, crawl, reach above the shoulder, reach at waist level, reach below waist/desk level, perform gross handling with either or both hands, perform fine motor fingering with either hand, or feel with either or both hands.  He noted that Garrett could occasionally drive and could occasionally perform fine motor fingering with both hands.  In the comments he wrote:  "Mr. Garrett has a longstanding history of chronic low back pain with intermittent R leg pain.  Annular tears L4-5 L5-S1[.]  He also has Right & Left shoulder pain due to adhesive capsulitis from arthroscopy."  (Adm. R. 261-62.)

Because of the disagreement between Drs. Bowen and Sanderson, Hartford referred Garrett to Dr. Earl Peeples, an orthopedic doctor, for an independent medical examination.  Peeples examined Garrett on August 25, 2005.  Peeples obtained a complete history and performed a thorough examination, the results of which he stated in a six-page report followed by three additional pages in which he responded to specific questions that Hartford had asked him to answer.  (Adm. R. 92-101.)  Peeples obtained medical records that showed Garrett's history of back problems as well

7

as a history of problems with his right shoulder. The pertinent part of Peeples's report on Garrett's physical examination states as follows:

> Thoracolumbar motion is limited with flexion only fingertips to knee and about 25% of anticipated lumbar extension.
>
> On examination of his upper extremities he is noted to have decreased range of motion of the right shoulder, 120 degrees flexion on the right compared to 150 on the left, 100 degrees abduction on the right compared to 150 on the left, 30 degrees external rotation on the right compared to 45 degrees on the left, and internal rotation is approximately equal.
>
> Circumferential measurements of the muscles were performed in the arms and were symmetric at 12 inches and forearms symmetric at 11.75 inches. Circumferential measurements of the thighs were symmetric at 21 and calves were symmetric at 15.
>
> Grip strength in the right hand on three measurements was 40, 47 and 40. On the left grip strength was 115 and 100. He is right hand dominant. He is noted to have grossly decreased right grip strength.
>
> On examination he is noted to have 2+ reflexes in the biceps, brachioradialis and triceps. The patellas are symmetric at 2+. The Achilles tendon on the left is 1+ and the right is trace.
>
> Muscle strength testing indicates decreased deltoid strength on the right at 3 or 4 compared to a 5 on the left. He also has mildly decreased external rotation strength on the right as compared to the left. Otherwise, his strength in the upper extremity is intact with intact wrist flexor, wrist extensor and interossei strength and intact strength in the lower extremities, quad, tibialis anterior, EHL and peroneal groups.

(Adm. R. 96-97.) Peeples's summary was:

> Mr. Garrett has degenerative changes in the lumbar spine on which basis he reports he has been placed on social security disability. His shoulder, also, is an important aspect of his inability to perform his activities at work and he believes this also influenced his approval for social security disability. He has a diagnosis of degenerative facet and disc disease in the lumbar spine and adhesive capsulitis, incomplete frozen shoulder, incompletely resolved, right.

(Adm. R. 97.) The pertinent questions and answers that followed were as follows:

1.      Please review the medical file and determine if Mr. Garrett has capability to function in any occupation full time.

Mr. Garrett probably has the physical capability to perform "some occupation" full time.  Light, sedentary or secretarial work would be within physical limitations, insofar as I am able to determine.  However, it is noted that he is trained as and has worked only as a diesel mechanic and is 60-years-old.  Multiple factors other than physical ability are appropriately considered in job selection.

* * *

3.      After your review and exam please supply us the proper restrictions and limitations that would be appropriate with Mr. Garrett's current conditions.

In my opinion, Mr. Garrett should be restricted from overhead lifting and from any type of heavy lifting.  He might be able to engage in some types of sedentary work.  I would recommend that an FCE be performed to see if specific documentation of reliability and defined physical performance status could be identified and substantiated.

4.      Do there appear to be any behavioral issues (i.e. symptom magnification, monetary gain, etc)

I did not identify any evidence of symptom magnification or secondary gain issues as I visited with Mr. Garrett and examined him.

* * *

9.      At what level of function do you feel Mr. Garrett would be able to perform safely (i.e. sed/light/med etc)

I have previously mentioned that I do not identify abnormalities which would prevent him from being employed in very sedentary activity and so advised Mr. Garrett.  To otherwise categorize or identify his functional status.  I think an FCE might be of benefit.

* * *

11.     Do you agree with Dr. Bowen's release and weight restrictions?

I agree with Dr. Bowen's report of August 24, 2004 at which time it is stated that he cannot return to heavy manual activity.  Dr. Bowen did not indicate that he was unable to do any activities whatsoever.  This is consistent with the prior portions of my report.  I do not see that Dr. Bowen provided a specific weight restriction.  It should be noted that, in addition to weight, the number of repetitions, position and awkwardness of the object being lifted are appropriate factors in consideration of ability to function in a job environment.

9

(Adm. R. 98-100.)

A claims examiner from Hartford wrote a letter to Peeples asking two follow-up questions, and Peeples responded as follows:

--On page #7 question #1, please describe what you mean by secretarial work.

I used the terms "sedentary or secretarial work". These are equivalent physical levels of activity implying work at a desk without heavy labor, lifting, prolonged standing, walking or twisting. Most white collar activities would fall into this category. This would include individuals who engage in basically clerical or paperwork functions and would include individuals engaged in inventory and computer entry. Occasional walking would be allowable.

--Do you agree with Dr. Bowen that the claimant can work in a sedentary occupation with a 10# lifting restriction for an 8 hour day?

I believe I have answered that question in answer #1 indicating that Mr. Garrett could return to sedentary type work. I did not assign an hour limit. I cannot provide any other information in addition to that provided in answer #11, but do agree that he could resume sedentary work, as I stated in the answer to question #1.

(Adm. R. 131.)

After receiving the report and the answers to the follow-up questions from Peeples on December 7, 2005, a rehabilitation case manager employed by Hartford prepared an employability analysis report using OASYS (Occupational Access System), a computerized job matching system that cross-references a person's qualifications profile with 12,741 occupations classified by the Department of Labor in the 1991 *Dictionary of Occupational Titles* (DOT). (Adm. R. 103-04.) The search by the OASYS software is based on information about a person's capabilities put in by the rehabilitation manager. According to the summary of the report, the rehabilitation case manager accepted Bowen's opinion that Garrett had the ability to engage in sedentary work and interpreted Peeples's report to say that Peeples agreed with Bowen. The report says, "In [Dr. Peeples's] report

dated 08/25/05 as well as his letter dated 09/28/05, Dr. Peeples offered the opinion that Mr. Garrett

might work in a sedentary occupation." (Adm. R. 103.) The report also states that the claimant had

worked as a diesel mechanic "for over 15 years." (Adm. R. 103.) Because the plan did not require

a claimant to accept employment at less than 60% of his pre-disability income, the target wage to

meet or exceed for Garrett was $2,134.08 per month. The conclusion of the report was:

> Two (2) unskilled occupations were identified by the OASYS software program that
> appear to be within the claimant's current residual functional abilities, education,
> training, employment history, hobbies, interests and special skills as well as the target
> gainful wage. Both are at the "Potential" level. Based on the National OES Wage
> Data (2003), the median monthly wages are $2286.26/month and $2799.33/month
> and exceed the targeted gainful wage of $2134.08/month. It is the professional
> opinion of this Rehabilitation Case Manager that the unskilled occupational
> alternatives listed below are compatible with the claimant's current functional
> abilities, education, training, employment history, hobbies, interests and special skills
> as well as the target gainful wage.

(Adm. R. 104.)

The two unskilled occupations found by the OASYS software program were: Polisher,

Eyeglass Frames, DOT No. 713.684-038, and Bonder, Semiconductor, DOT No. 726.685-066. As

the report mentioned, both were at the "potential" level. According to the administrative record, the

OASYS software places jobs that match with a claimant's capabilities into one of four categories.

"Potential" is the category that represents the weakest match between the claimant's capabilities and

the job duties. "Potential" means that the transferability of the claimant's skills to the "potential"

occupation is low. For the claimant to work in an occupation identified at the "potential" level, there

must be a plan development and training. The other categories are: "Closest," for which the

transferability of the claimant's skills is excellent and training would be minimal; "Good," for which

the transferability of the claimant's skills would be good to moderate and would involve some

training; and "Fair," which indicates fair transferability but would require a plan and some training.

(Adm. R. 109.)

The DOT description of the two occupations that the OASYS software found as "potential"

matches for Garrett are:

**713.684-038 Polisher, Eyeglass Frames**
Polishes plastic eyeglass frames and temple pieces to remove scratches and pit marks, using polishing wheel: Applies abrasive compound to wheel surface, using brush. Starts machine and holds and turns frame parts against wheel to polish parts and remove defects. Inspects and feels polished parts to verify removal of flaws. Presses sandpaper against polishing wheel to remove abrasive residue in preparation for next sequence.

(Adm. R. 110.)

**726.685-066 Bonder, Semiconductor**
Tends automatic bonding machine that bonds gold or aluminum wire to integrated circuit dies to connect circuitry to package leads: Reviews schematic diagram or work order to determine bonding specifications. Turns dials to set bonding machine temperature controls and to regulate wire feeding mechanism. Mounts spool of wire onto holder and inserts wire end through guides, using tweezers. Positions semiconductor package into magazine of automatic feed mechanism, and observes package, using microscope or equipment display screen, to ensure connections to be bonded are aligned with bonding wire. Adjusts alignment as necessary. Activates machine that automatically bonds wire to specified connections on semiconductor package leads. Removes packages from bonding machine and places packages in work tray. May test tensile strength of bonded connections, using testing equipment. May locate connections and bond wire to connect circuitry of hybrid circuits, using precision-bonding machine.

(Adm. R. 112.)

After receiving the employability analysis report from the rehabilitation claims manager,

Hartford's claims examiner wrote a letter to Garrett informing him that he was capable of being an

eyeglass frames polisher or a semiconductor bonder and therefore was not prevented from

performing the essential duties of any occupation for which he was qualified by education, training,

12

or experience.  Thus, Hartford would not pay long-term disability benefits beyond January 31, 2006.

(Adm. R. 56-60.)

Garrett wrote a letter appealing the decision in which he stated:

I don't understand how this determination was made.  The problems I have with my shoulder are unimproved.  This limits any work at all with that arm.

I am still on pain medication for my back.  As Dr. Peeples (your doctor) can verify my MRI shows the discs trying to fuse together -- and the point it is growing together breaks before it is fused.  This causes me severe pain when this happens.  I have been told by orthopedists that surgery is not an option.

As you already know I receive Social Security benefits in the amount of $1500+ per month.  I will not be eligible for Medicare until July 22, 2006.  At this time my wife and I are paying $900 per month for health insurance.

There are times when I have better days than others.  When I have to take pain medications I am not supposed to drive, etc.

I have worked on big trucks since 1965 (40 years -- not 15 years) and that is basically all I am trained to do.  I am 61 years old and have dealt with severe panic attacks since I was in my 20's.

Due to the above I would appreciate it if you would reconsider cutting my disability benefits off.

(Adm. R. 55.)

Hartford responded in March of 2006 and again denied Garrett's claim on the ground that Garrett was capable of sedentary work and that the employability analysis identified "several gainful occupations" that Garrett could perform.  Adm. Rec. 0043-44.

## IV.

In *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), the claimant argued that she was disabled due to fatigue and pain.  The record showed three conditions that could have contributed to her disability: Post Polio Syndrome ("PPS"), depression, and obesity.  *Id.* at 886.  An independent

medical examiner suggested that obesity and depression caused or contributed to her fatigue. *Id*. at 887. Nevertheless, the plan focused only on the claimant's PPS. *Id*. The independent medical examiner concluded that the claimant was able to work full time without disputing her claim of fatigue, diagnosis of PPS, or another examiner's finding of progressive weakness. *Id*. The court said, "the Plan is not free to accept this report without considering whether its conclusions follow logically from the underlying medical evidence." *Id*. The court further held, "A reviewing court must remand a case when the court or agency fails to make adequate findings or explain the rationale for its decision." *Id*.

This case is similar. It is apparent that Hartford chose to consider only the medical evidence that would show that Garrett was not disabled and failed to consider evidence to the contrary.[1] Hartford's employability and analysis report is based on the assumption that Garrett has the ability to engage in any kind of sedentary work. Based on that assumption, the OASYS software found two occupations that would meet the minimum income level required by the policy and that Garrett potentially could do. Both of those jobs – polisher of eyeglass frames and semiconductor bonder – are manual labor occupations that require extensive use of the hands. Peeples reported:

> Grip strength in the right hand on three measurements was 40, 47 and 40. On the left grip strength was 115 and 100. He is right hand dominant. He is noted to have grossly decreased right grip strength.

(Adm. R. 96.)

---

[1] It is noteworthy that the questionnaires that Hartford sent to Sanderson and Bowen directed them to submit a narrative if the doctors did not agree that Garrett could perform a sedentary or light occupation, but no narrative was required if the doctors agreed that Garrett could perform a sedentary or light occupation. Nothing in the record explains why Hartford needed no narrative to support an opinion that Garrett could perform sedentary or light work but needed one to support an opinion that he could not.

Hartford's employability analysis report says that Peeples had opined that Garrett could perform sedentary work, but Peeples did not use the term "sedentary work" to encompass all work that falls within the definition of "sedentary" in the DOT.  In his answer to Hartford's first question appended to his report, Peeples stated:

> Mr. Garrett probably has the physical capability to perform "some occupation" full time.  Light, sedentary or secretarial work would be within physical limitations, insofar as I am able to determine.  However, it is noted that he is trained as and has worked only as a diesel mechanic and is 60-years-old.  Multiple factors other than physical ability are appropriately considered in job selection.

(Adm. R. 98.)  When Hartford wrote and asked for clarification as to what Peeples meant, he responded:

> I used the terms "sedentary or secretarial work".  These are equivalent physical levels of activity implying work at a desk without heavy labor, lifting, prolonged standing, walking or twisting.  Most white collar activities would fall into this category.  This would include individuals who engage in basically clerical or paperwork functions and would include individuals engaged in inventory and computer entry.  Occasional walking would be allowable.

(Adm. R. 131.)

Hartford disregarded the portion of Peeples's report that stated that Garrett was right-handed and had "grossly decreased right grip strength."  (Adm. R. 96.)  When Peeples explained what he meant by "sedentary or secretarial" work that would fall within Garrett's capabilities, he referred to white collar or clerical work, *i.e.*, work with which the grossly diminished grip strength of his right hand would not interfere.  Likewise, Peeples noted Garrett's age – he was then sixty years old – and that he had never worked in any occupation other than as a diesel mechanic.  Hartford disregarded Garrett's age and failed to take full account of the length of time that Garrett had worked as a diesel mechanic.  Nowhere in the employability analysis report is Garrett's age mentioned, nor is his age

15

mentioned anywhere in either of the two letters in which Hartford explained its reasons for denying Garrett's claim.  The employability analysis report does say that Garrett had worked as a diesel mechanic "for over 15 years," but that understates the difficulty that Garrett would face in making the transition to a new occupation.  In fact, Garrett had worked almost 40 years as a diesel mechanic; he never held a job as an adult other than as a diesel mechanic.  By the time Garrett was thirty-five years old, he had already been a diesel mechanic for over fifteen years.  The employability analysis report makes no distinction between a thirty-five-year-old man who has worked as a diesel mechanic for over fifteen years and a sixty-year-old man who has worked as a diesel mechanic for forty years.

While Bowen completed a physical capacities evaluation form on May 4, 2005, in which he stated that Garrett could frequently use his hands for gross motor skills and to constantly use them for fine motor skills, it is not evident from the record on what basis he formed those conclusions. Bowen treated Garrett's right shoulder from February 2004 through August 2004, without success. Bowen's records do not show that he ever tested Garrett's grip strength; nothing in his records shows that he ever examined Garrett's hands so as to have a basis for forming the conclusions that he indicated on the physical capacities evaluation form regarding what Garrett could do with his hands. Hartford "is not free to accept this report without considering whether its conclusions follow logically from the underlying medical evidence."  *Abram*, 395 F.3d at 887.

Garrett's letter appealing the decision to deny his benefits made several points that Hartford did not address in its subsequent letter reaffirming the earlier decision.  Garrett's letter says that he could not "work" at all with his right arm.  Garrett never said that he could not use his right arm, only that he could not "work" with it.  For a man with Garrett's education and work history to say that he cannot "work" with his right arm is to say that he could not use his right arm in manual labor,

which is not inconsistent with Peeples's opinion that Garrett's physical capacities would limit him to clerical or white collar work.  Garrett also said in his appeal letter that he had severe back pain. Peeples noted Garrett's back problems in his report, as did Sanderson in his Physical Capacities Evaluation Form, but Bowen did not mention Garrett's back problems.  Garrett's appeal letter also mentioned that he had been a diesel mechanic for forty years, not fifteen years, and that he did not know how to do anything else.  In addition, Garrett mentioned in his letter that the Social Security Administration had determined that he was disabled.

Hartford's letter reaffirming its original decision did not respond to any of the issues raised by Garrett in his appeal letter.  Although Hartford's letter in response acknowledged Garrett's weakness in his right arm and hand and that he was right hand dominant, it did not explain how he could work as a polisher of eyeglass frames or a semiconductor bonder with that disability. Hartford's response letter really said nothing other than that Bowen had opined that he could do sedentary work and Peeples had agreed "that you could perform sedentary type work that did not require lifting, prolonged standing, walking or twisting."  In other words, the response letter did not address the issue of whether Garrett could perform manual labor with his right hand, which is his dominant hand.  The response letter did not address Garrett's point that he had worked forty years, not fifteen years, as a diesel mechanic, nor did it address his age.  Hartford's response letter did not address Garrett's point that the Social Security Administration had determined that he was disabled. Although the determination of the Social Security Administration is not binding on Hartford, it is admissible evidence to support Garrett's claim.  *Duffie v. Deere & Co.*, 111 F.3d 70, 74 n.5 (8th Cir. 1997); *Milburn v. The Hartford Life and Acc. Ins. Co.*, 2007 WL 854824, at *4 (W.D. Ky. March 19, 2007).  "ERISA and its accompanying regulations essentially call for a 'meaningful dialogue

between the plan administrators and their beneficiaries.'" *Abram*, 395 F.3d at 886 (quoting *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)). Here, there was no "meaningful dialogue" because Hartford never responded to any of the points that Garrett had raised on appeal.

Whether reviewing for abuse of discretion or *de novo*, the Court would consider Garrett's grossly diminished right grip strength and the fact that he is right hand dominant, in addition to his frozen right shoulder and the degenerative changes in his lumbar spine, which, according to Peeples's report, was apparently the basis on which the Social Security Administration determined Garrett to be disabled. *Cf. Abram*, 395 F.3d at 887. Garrett's age and the fact that he had worked as a diesel mechanic for almost forty years, not merely fifteen years, all are facts that should also be considered. Hartford either did not consider these factors or failed to explain its rationale for concluding that Garrett was able to work notwithstanding these facts. Therefore, following *Abram*, this Court will reverse and remand for further proceedings.

## CONCLUSION

For the reasons stated above, the decision of The Hartford Life and Accident Insurance Company determining that Carroll Garrett was not eligible for long-term disability benefits is reversed, and the claim is remanded for further proceedings consistent with this opinion. Hartford must consider Garrett's grossly diminished right grip strength, the fact that he is right hand dominant, his age, the fact that his only employment during the almost forty years of his adult work history was as a diesel mechanic, and the degenerative changes in Garrett's lumbar spine noted in Peeples's report and in other medical records in the administrative record.

All pending motions are denied as moot.

18

IT IS SO ORDERED this 8th day of November, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE